```
1                IN THE UNITED STATES DISTRICT COURT
                    WESTERN DISTRICT OF VIRGINIA
2                        ROANOKE DIVISION

3    UNITED STATES OF AMERICA,

4            Plaintiff,            CASE NO.: 7:18-MJ-00149
                                   December 26, 2018
5                                  Roanoke, Virginia
                                   Supervised Release Revocation
6    -v-                           Hearing

7    BRIAN DAVID HILL,             Before:
                                   HONORABLE ROBERT S. BALLOU
8                                  UNITED STATES MAGISTRATE JUDGE
             Defendant.            WESTERN DISTRICT OF VIRGINIA
9
     ****************************************************************
10   APPEARANCES:

11   For the Plaintiff:

12       KARI KRISTINA MUNRO
         United States Attorneys Office
13       310 First Street, S.W. Room 906
         Roanoke, VA 24008
14       540-857-2907
         kari.munro@usdoj.gov
15
     For the Defendant:
16
         RANDY VIRLIN CARGILL
17       Federal Public Defenders Office
         Suite 420
18       210 First Street, SW
         Roanoke, VA 24011
19       540-777-0880
         randy_cargill@fd.org
20

21   _____

22              Kelly Brown - FTR Recorder
             Mary J. Butenschoen - Transcriber
23

24   PROCEEDINGS TAKEN BY FTR; TRANSCRIBED USING COMPUTER-AIDED
     TRANSCRIPTION
25
```

INDEX

WITNESS NAME                                                          PAGE

JASON McMURRAY

    Examination By The Court ................................... 5

    Examination By Ms. Munro ................................... 8

    Examination By Mr. Cargill ................................ 16

    Examination By Mr. Munro ................................... 18

\* \* \* \* \*

1   (Proceedings commenced 2:45 p.m.)

2          THE CLERK:  *United States of America v. Brian David*

3   *Hill*, Case Number 7:18-MJ-149.

4          THE COURT:  All right.  Let the record reflect the

5   government is present by its counsel.  The defendant likewise

6   is present along with counsel.

7          Mr. Hill, good afternoon.  My name is Robert Ballou.

8   I'm a magistrate judge here in the Western District of

9   Virginia.  We are here today in connection with a petition that

10  has been filed in the Middle District of North Carolina to

11  revoke the terms of your supervised release.  You will recall

12  that you were sentenced down in the Middle District of North

13  Carolina on a -- on a charge -- I can't tell the date of the

14  original -- in November of 2014 on a charge of possession of

15  child pornography.  Following a term of imprisonment you had

16  some supervised release to address, and the petition alleges

17  that you violated the terms of your supervised release.

18          Do you understand these things?

19          THE DEFENDANT:  Yes.

20          THE COURT:  All right.  Let me begin, first of all,

21  by asking you to state your full name for me, please.

22          THE DEFENDANT:  B-R-I-A-N.

23          THE COURT:  Just tell me your name.

24          THE DEFENDANT:  Brian David Hill.

25          THE COURT:  All right.  How old are you, Mr. Hill?

1    THE DEFENDANT:  What was your question?

2    THE COURT:  How old are you?

3    THE DEFENDANT:  I'm 28 years old.

4    THE COURT:  Okay.  Do you take any medication?

5    THE DEFENDANT:  Insulin, and I think it's Novolog and

6    Lantus.

7    THE COURT:  All right.  What do you take those last

8    two for?

9    THE DEFENDANT:  Managing my type 1 brittle

10   diabetes.

11   THE COURT:  All right.  So all the medication you

12   take is for your diabetes; is that correct?

13   THE DEFENDANT:  I also take medication for my carpal

14   tunnel.

15   THE COURT:  Okay.  All right.  Is that all you take

16   medication for?

17   THE DEFENDANT:  Piedmont Community Services did

18   prescribe me medication for anxiety.

19   THE COURT:  Okay, for anxiety?  Okay.  What

20   medication is that?

21   THE DEFENDANT:  I don't know the name.

22   THE COURT:  Okay.

23   THE DEFENDANT:  But it's -- I don't know.

24   THE COURT:  Okay.

25   All right.  Counsel, before we get too far into this

hearing, certainly no issue as it relates to identity; is that

right, Mr. Cargill?

          MR. CARGILL:  Correct, Your Honor.

          THE COURT:  All right.  Before we get too far into

this hearing, I did meet with Mr. McMurray, who I think had

been supervising Mr. Hill in advance.  I've got concerns about

Mr. Hill's ability to be able to participate in his defense, at

least at this state, so I'm going to call Mr. McMurray first

and address where we are in that regard.

          Mr. McMurray, if you can come on up and be sworn.

You-all please have a seat, Mr. Hill.

          JASON McMURRAY, CALLED BY THE COURT, SWORN

                         EXAMINATION

          THE COURT:  Mr. McMurray, if you could state your

full name for me and tell me who you're employed by.

A    Jason McMurray.  I am a United States Probation Officer

for the Western District of Virginia.

          THE COURT:  Are your caseload dealing with

supervising Brian David Hill?

A    I have supervised, that's correct, Mr. Hill since

approximately July 9 of 2015.

          THE COURT:  All right.  And Mr. Hill is sitting here

in the courtroom with his counsel?

A    He is seated to Mr. Cargill's left, that's correct.

          THE COURT:  All right, very well.  Tell me how you

McMurray (the Court)                                              6

1   came to be Mr. Hill's supervisor.

2   A    Mr. Hill -- there was a petition for revocation of

3   supervised release filed prior to myself assuming supervision

4   in the Middle District of North Carolina.  His previous

5   probation officer had filed that.

6        The Court in Middle District of North Carolina chose not

7   to revoke Mr. Hill's supervision; chose to continue him on

8   supervision, modifying his conditions so that he would have to

9   serve six months of home detention.  And when he was released,

10  that's when I took over his case for supervision.

11              THE COURT:  All right.  And, of course, there's a

12  petition that's been filed in connection with some charges down

13  in the City of Martinsville, I believe?

14  A    That's correct.  He was arrested September the 21st, 2018,

15  in the City of Martinsville for indecent exposure.

16              THE COURT:  All right.  And have you expressed to me

17  some concerns about Mr. Hill's present mental capacity?

18  A    Based on some letters I have received from Mr. Hill since

19  he was incarcerated, that is correct.  I do have some concerns

20  for his mental capacity.

21              THE COURT:  Tell me a little bit about those.

22  A    Well, I'm in possession of four letters that were written

23  by Mr. Hill, or at least represented to be written by Mr. Hill.

24  And in the letters there's a recurring theme of a man in a

25  hoodie forcing Mr. Hill -- breaking into his house forcing

McMurray (the Court)                                    7

1   Mr. Hill to leave his home, strip nude, and walk.

2       He was -- if I may, he was found walking nude on a walking

3   trail in Martinsville on September the 21st, and these letters

4   state that an individual in a hoodie came after him, made him

5   strip down naked or they would go after his mother.

6           THE COURT:  All right.  And these are all written to

7   you after -- within the last three or four months?

8   A    These were all addressed to me after he was arrested and

9   incarcerated in Martinsville.  They all came from the

10  Martinsville City Jail.

11          THE court:  All right.  Has he expressed to you any

12  perception about his grasp of the -- kind of the overall world

13  around him and -- I'll state it another way.

14          The standard I need to deal with is whether he may be

15  suffering -- whether there's reason to believe that he's

16  suffering from a mental disease or defect that will affect his

17  ability to defend himself in connection with this particular

18  petition.

19  A    Would it help if I read excerpts from the letters?

20          THE COURT:  If you could just do that just so we can

21  know what the record will have.

22  A    A letter I have here dated December 13, 2018, would you

23  like me to read the whole thing, Your Honor, or --

24          THE COURT:  Not the whole thing.  Just explain what's

25  in the letter and --

McMurray (Munro)                                                          8

1   A    In the letter, as I stated before, he -- he states that he

2   has done good under me as a probation officer "until the guy in

3   the hoodie came after me by going after my mom.  I knew the

4   risks, and when I filed my 2255 motion and brief proving fraud

5   upon the court in proving their crimes puts a big target on my

6   back."

7       Another excerpt states, "They will probably kill Donald

8   Trump and his whole family or imprison them, all then do the

9   same thing to me and my whole family like the Nazis did in

10  Germany.  The U.S. Attorney won't stop coming after me until I

11  die or rot in prison forever.  They do not want my friends and

12  family to tell the truth, especially online."

13              THE COURT:  All right.  Okay, I think I understand

14  where things are.

15              Ms. Munro, any questions for Mr. McMurray?

16              MS. MUNRO:  A couple, I think --

17              THE COURT:  Sure.

18              MS. MUNRO:  -- for the record as it relates to that

19  issue.

20                            EXAMINATION

21  BY MS. MUNRO:

22  Q    So I think you indicated you'd been supervising him since

23  2015?

24  A    Yes, ma'am, that's correct.

25  Q    Is that when he came to Martinsville?

McMurray (Munro)                                                    9

1    A    He was living in Martinsville prior to that when Officer

2    Burton was supervising him.

3    Q    Okay.  And why did he come to Martinsville, do you know,

4    from North Carolina?

5    A    That's where his family was residing.  His grandparents --

6    grandmother, grandfather -- and his mother all reside in

7    Martinsville.

8    Q    And they still currently reside there?

9    A    Yes, ma'am, that's correct.

10   Q    And is that the family members with whom he's been

11   residing between 2015 and the present?

12   A    That's correct.  He was residing in a home with both

13   grandparents and a mother.  And within the last year, year and

14   a half, the mother and Mr. Hill obtained their own housing, one

15   of -- it's a home, a duplex, that has a first floor and a

16   second floor.  Mr. Hill resides on the bottom floor with his

17   own private entrance.

18   Q    Okay.  And then the family members who are upstairs are

19   who?

20   A    It's just his mother.

21   Q    Just his mother.

22   A    Yes.

23   Q    But as of a month or so ago, it was -- it also included

24   his grandparents?

25   A    No, ma'am.  That's -- that's not correct.

McMurray (Munro)                                                      10

1      About a year, year and a half ago, give or take, Mr. Hill

2   and his mother moved out of the grandparents' home.

3   Q    Okay.  Now, you indicated that you had taken part in the

4   filing of a petition back in September of 2015 relating to some

5   violations down in North Carolina; is that correct?

6   A    It was more of a notice of noncompliance than it was a

7   petition.  Mr. Hill, part of his supervised release was that he

8   complete or participate in certified sex offender treatment,

9   which we referred him to treatment.  And the treatment provider

10  found that he was not amenable to treatment.  Mr. Hill does not

11  accept responsibility for the conviction, and that in a sex

12  offender treatment setting, that hinders the group.

13      So since he did not successfully complete the treatment, I

14  had to notify Middle District of North Carolina.  The court

15  down there stated that if Mr. Hill was otherwise compliant that

16  we could allow him to remain on supervision, and he was.  So he

17  continued his supervision.

18  Q    But when you say he wasn't taking responsibility for the

19  underlying conviction, do you mean that child pornography

20  conviction in 2014?

21  A    That's correct.  That's correct.

22  Q    I see.  And around that period of time when you first met

23  and started supervising Mr. Hill, were you aware then whether

24  there were other instances in which he was doing a lot of

25  letter writing or posting on the internet in relation to his

McMurray (Munro)                                                    11

1   criminal cases?

2   A    He has engaged in that behavior for quite a while.  Prior

3   to my taking over supervision of the case, he was filing

4   numerous motions in Middle District of North Carolina.  That's

5   something he did quite often.  I can't give you numbers or

6   exactly what it was, but that is something that he has done in

7   the past, is file motion after motion with the court.

8   Q    I think one of the excerpts that you read indicated that

9   he believed that the U.S. Attorney, is what he described it as,

10  would keep coming after him until he was dead.

11      Has he made similar kinds of allegations against other

12  people involved in his prosecutions in the past?

13  A    He has.  Mr. Hill has spent a majority of his time

14  focusing on trying to get his underlying charge of having an

15  appeal, having it overturned.  That is what he is focused on.

16  Q    Okay.  Has he focused on any particular individuals in

17  connection with that prosecution?

18  A    Various individuals in the past.  I cannot pronounce this

19  Assistant U.S. Attorney's name, but it's a recurring last name.

20  I could spell it, but I can't pronounce it, unfortunately.  But

21  I would spell it if you'd like me to.

22  Q    Sure, that would be fine.

23  A    Assistant U.S. Attorney P-R-A-K-A-S-H, first name.  Last

24  name R-A-M-A-S-W-A-M-Y.  His spelling, of course.

25  Q    Is it your interpretation that that's the same AUSA that's

McMurray (Munro)                                                    12

1   listed in this petition that is currently before the Court as

2   the original prosecuting AUSA?

3   A   I'll have to view the petition to double check.

4   Q   Okay.  It's possible, though; is that correct?

5   A   It is possible, but I'll have to review the petition.

6   Q   And you indicated that he was charged in Martinsville with

7   indecent exposure.  Was he tried?

8   A   This just occurred last Friday.  I'm not privy to the

9   court documents, as I don't think they have been filed.  I know

10  that he had planned to plead not guilty.  In my view of the

11  online Virginia court website, it appears that he pled not

12  guilty but was found guilty, sentenced to 30 days in custody,

13  which was tantamount to time served, and he's now in our

14  custody.

15  Q   Okay.  And do you know whether or not he made any

16  statements at the time of his arrest in Martinsville about this

17  man with the hoodie?

18  A   I can speak to the arresting officer's report in which he

19  stated that a man in a hoodie forced him to leave his home and

20  undress.

21  Q   Okay.  And then finally, have you spoken with his family

22  members in connection with the instant petition in preparation

23  for the hearing today?

24  A   I spoke with his grandfather a week ago Tuesday.

25  Q   Okay.  And so the Court understands, what have his family

1    members indicated, first of all, about his living arrangement

2    here in the Western District?

3    A    They indicated to me last Tuesday -- well, "they" I mean

4    the grandfather -- indicated to me that they can't house

5    Mr. Hill due to his medical issues.  He suffers from diabetes,

6    amongst other ailments, and they have been seeking an assisted

7    living environment if he were to qualify for one, but they

8    stated that they can't house him any longer.

9    Q    I see.  And when you say they, does that include his

10   mother, or did you not speak with his mother?

11   A    I have not spoken with his mother in quite some time, but

12   his grandfather indicated that he would not have a place to

13   live.  That's how I took it.  Because when he called last

14   Tuesday, Mr. Hill was due in Martinsville City court on Friday,

15   his grandfather was concerned if he were to get out that Friday

16   where would he go, because he doesn't have a home.

17   Q    Okay.  And then finally, what do you understand about the

18   nature of his diabetes?

19   A    Obviously, not a medical professional, but I have spoken

20   with his family numerous times about his diabetes.  His

21   diabetes is very severe.

22   Q    Okay.

23   A    I'm -- I can't get into the scientific nature, but he does

24   suffer greatly from great spikes in blood glucose, I think, and

25   then it bottoms out.  He does have a lot of issues with

McMurray (Munro)                                                    14

1    diabetes.

2    Q    Did his family members talk to you about whether they have

3    had, specifically, difficulty with those spikes and drops in

4    his diabetic condition?

5    A    His mother told me on one occasion that she was going

6    downstairs to his portion of the domicile every morning very,

7    very early to check his blood sugar because there have been a

8    couple mornings that he -- he was having a hard time waking up.

9    So she would go down early to check his blood sugar to see if

10   he needed insulin or -- not insulin, but if he would need to

11   take some form of sugar supplement to get his blood sugar up.

12   Q    Okay.

13   A    Or opposite.

14        MS. MUNRO:  Okay.  All right.  Nothing further.

15   Thanks.

16        THE COURT:  Before you ask any questions,

17   Mr. Cargill, tell me about anything that you've seen with

18   respect to Mr. Hill in connection with his -- when you've

19   visited him in his home and his perspective on where he is in

20   life.

21        THE WITNESS:  Well, I have been to Mr. Hill's home

22   numerous times, and, as I've stated previously, whenever I'd

23   ask him how he was doing, he was very polite and was always

24   welcoming.  He could be sometimes hard to -- excuse me,

25   difficult to communicate with because he is on -- has been

1    diagnosed on the autism spectrum, so it's kind of difficult to

2    converse with him sometimes.  But he's always been very polite

3    to me.  Allows me to come in and do the home contact.  He's

4    always obsessed about this 2255 motion that he discusses in

5    these letters trying to get his case overturned.

6              One thing in particular that stands out is his

7    obsessive-compulsive disorder, which the presentence report

8    from the Middle District of North Carolina highlights as a

9    prior diagnosis.  He undertakes a -- what I would call a

10   handwashing routine every morning, and it -- and his mother has

11   verified this, for hours at a time.  There have been times that

12   I've went by the residence at 10:30, 11 o'clock in the morning,

13   and he would come to the door covered literally head to toe in

14   soap suds as he was engaging in his routine.  Actually, the

15   last home contact that I was -- I was there, there was standing

16   water in the kitchen.  He was engaging in his handwashing

17   routine, and dozens and dozens, if not over a hundred slivers

18   and cakes of soap piled up indicating that he was engaging in

19   his handwashing routine.

20             That same day I went upstairs to speak with his

21   mother, and she indicated that he was continuously doing that

22   every morning.  And you could see the effects of which in the

23   kitchen from the water and the damage that it had caused.  It

24   seemed every time I was there that's what he was doing.

25             THE COURT:  All right.  Okay.  That's all the

1   questions I have.

2          Mr. Cargill, does that prompt any questions you --

3          MR. CARGILL:  Oh, just a few.

4                         EXAMINATION

5   BY MR. CARGILL:

6   Q    So during the time that you have supervised him,

7   Mr. McMurray, has he seen a mental health provider for

8   evaluation and --

9   A    He was going to a counselor twice per month, is a

10  Dr. Preston Page that Mr. Hill's -- I think it's Medicaid that

11  he has.  I'm not sure if it's Medicaid/Medicare -- that he was

12  seeing twice per month and that I had contact with to see his

13  progress from time to time.

14  Q    How does the -- how does the mental health provider, how

15  does he or she feel about his mental state, or does the person

16  share --

17  A    I have not spoken with Mr. Page since the last time I was

18  at his -- at Mr. Hill's residence.  And after speaking with the

19  mother, I called Mr. Page and I said this was quite concerning.

20  And it was not very long before he was arrested for the

21  indecent exposure.  And I spoke with Mr. Page about it, and

22  Mr. Page advised that -- that he was due to see him soon and

23  that if he felt that there needed to be a further referral,

24  perhaps the Piedmont Community Services, then that would be

25  undertaken, but that appointment did not occur.

McMurray (Cargill)                                                17

1   Q    So your -- to your knowledge, he has not been on

2   medication for any mental health issues.

3   A    No, sir, it's -- it's been limited to his diabetes and

4   medication.

5   Q    Do you know whether he was evaluated mentally in

6   connection with the state charge, the indecent exposure

7   charge?

8   A    From my knowledge, they took him to the Martinsville

9   hospital the night of the arrest and they released him.  I

10  don't know if that was more of a TDO type thing to gauge

11  whether he was a danger to himself or others or if it was more

12  mental health oriented.  I do not have the answer to that.  But

13  he was released that night and taken into custody.

14  Q    But you have a general release that would allow you to get

15  any of those records; is that correct?

16  A    Yes, sir.

17  Q    Including any mental evaluation prepared in connection

18  with the state charge?

19  A    Yes, sir, I could -- I could receive those, yes.

20  Q    I checked the online court records myself, and it

21  indicates right at the very top in red that his state case was

22  appealed to circuit court effective today.  Is that what you

23  found, too?

24  A    I printed that out as well today, sir, and I noted the

25  same thing.

McMurray (Munro)                                                    18

1    Q    What does -- how does that affect his revocation in Middle

2    District?

3    A    Not having worked for that court, I'm not sure I could

4    give you an answer, but I know that a conviction is not

5    required, that a revocation can take place based on offense

6    conduct alone at a preponderance of the evidence.  I'm not sure

7    how Middle District of North Carolina would wish to proceed.

8    Q    But in all events, since it's an active case in state

9    court, it will at least be, what, some sort of detainer?

10   A    I don't have the answer to that.

11   Q    I'll research that, all right.

12   A    I know that a warrant hasn't been lodged as of this moment

13   because I would receive notification.  I have not received that

14   yet.  I'm not saying that it couldn't happen.

15   Q    And he's always just -- in my limited -- he's exceedingly

16   polite, isn't he?

17   A    Yes.  He's always been polite, yes.

18              MR. CARGILL:  All right.  Thank you, sir.

19              THE COURT:  All right.  Any further questions,

20   Ms. Munro?

21              MS. MUNRO:  Just one.

22                            EXAMINATION

23   BY MS. MUNRO:

24   Q    For how long was he seeing Dr. Page, do you know?

25   A    He has seen Dr. Page pretty much for the duration that

1    I've supervised him.

2    Q    Okay.  So since 2015?

3    A    Give or take, yes.

4          MS. MUNRO:  Okay.  All right, thank you.

5          THE COURT:  Thank you very much.

6          Thank you, Mr. McMurray.  You may step down.

7          All right.  Before we go any further into this

8    initial appearance, I do have concerns about exactly where

9    Mr. Hill is from a psychological and psychiatric standpoint and

10   whether he does suffer from mental disease or defect that would

11   affect his ability to understand and participate in his

12   defense.

13         It's now further complicated by one of the things

14   that you just indicated, Mr. Cargill, and that is since he's

15   appealed his conviction down in City of Martinsville he's

16   entitled to a trial de novo on that issue down there.  If he

17   is -- which is what I would prefer.  If he is sent to an

18   evaluation at the -- with the Bureau of Prisons, that's going

19   to complicate his situation in Martinsville.

20         Do you know, Mr. Cargill, whether he was represented

21   by counsel?

22         MR. CARGILL:  Mr. Hill advises that he was

23   represented by a public defender, Scott Albrecht.  And

24   evidently -- and don't go into any details, Brian, but I think

25   Brian filed a notice of appeal pro se.  I don't believe his

1  attorney --

2          THE COURT:  Don't believe his attorney did.

3          MR. CARGILL:  He also tells me, Your Honor, that

4  there was a competency evaluation conducted as part of his

5  state case but that it was a local -- someone visited him in

6  the jail.

7          THE COURT:  Local evaluation.

8          MR. CARGILL:  Yes.

9          THE COURT:  All right.  But my -- my initial concern

10  is that if -- if -- if Mr. Hill is correct that there was a --

11  if Mr. Hill believes and it's not in fact borne out that

12  someone made him do what he said what he's charged with doing

13  down in City of Martinsville, that's a problem from a mental

14  standpoint.  And if he did it on his own volition and that's an

15  excuse, that's another problem that he's going to have to deal

16  with down in North Carolina.  I think that we're much, much

17  better off understanding exactly where he is from a mental

18  health standpoint before he's sent back down there.  I think he

19  has to be evaluated here because I can't ask him to make a

20  decision about having hearings up here because he's entitled to

21  a preliminary hearing, he's entitled to all that here in this

22  Court before he would go down to North Carolina, and I don't

23  think -- I don't think he can make a knowing waiver or knowing

24  decision to have those at this point.

25          So -- so Mr. Hill, let me ask you to stand up, if you

1    would, please, sir.

2           THE DEFENDANT:  Yes, sir.

3           THE COURT:  I've got significant concerns about

4    whether you presently suffer from a mental -- mental health

5    disease or defect that affects your ability to be able to

6    participate and actively assist your counsel in addressing the

7    issues that are raised in the -- in the petition.

8           I've also got -- does insanity defense apply on a

9    supervised release violation?  I've never -- never had that

10   addressed.

11          MR. CARGILL:  Oh, I'd say so, yes.

12          THE COURT:  I would say so.

13          MR. CARGILL:  Yes, sir.

14          THE COURT:  So I've got significant concerns about --

15   about that as well.  And so I'm going to -- I'm going to ask

16   you -- or I'm going to place you in the custody of the United

17   States Marshal, or United States Attorney General, and I'm

18   going to have you evaluated, have a full and complete and

19   thorough evaluation of your mental health situation so that

20   that can be addressed.  If you need to have medication, you can

21   be placed on proper medication before you come back here to

22   address -- address these matters.  And I'm going to ask that

23   they evaluate under both 4241 and also 4242 as well.  That will

24   also significantly assist your counsel both here and down in

25   North Carolina if the matter goes back down to North Carolina.

1    Do you understand?

2    THE DEFENDANT:  Yes.

3    THE COURT:  All right.  So I'm going to -- you're

4  probably going to be transferred to a facility either in North

5  Carolina or some other place nearby, we hope, for an

6  evaluation, and then you'll be brought back here.  It could be

7  a couple or three months from now when you're brought back

8  here, but you'll be in a much better position for me to be able

9  to understand your situation when that occurs, all right?

10    So I'm going to leave you with Mr. Cargill to answer

11  any questions, which is better to be able to proceed in that

12  regard, and I'll get that order entered today, all right?

13    Ask your question to Mr. Cargill first before you ask

14  it of me.

15    THE DEFENDANT:  What if I'm found not guilty in the

16  Circuit Court of Martinsville?

17    MR. CARGILL:  That will play out.  That will play

18  out.

19    THE COURT:  All right.  And -- all right.

20    Anything else I need to address, Ms. Munro?

21    MS. MUNRO:  Nothing further.

22    THE COURT:  Mr. Cargill?

23    MR. CARGILL:  No.  Thank you, Your Honor.

24    THE COURT:  All right, very well.  Court will stand

25  in recess.

1          (The proceedings concluded at 3:12 p.m.)

2                          **CERTIFICATE**

3          I, Mary J. Butenschoen, do hereby certify that the
   foregoing is a correct transcript of the electronic recording
4  in the above-entitled matter.

5                  _____/s/_____5/2/2022
                  Mary J. Butenschoen, Transcriber

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25